IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

YVETTE MONTOYA,

        Plaintiff,

vs.                                                                                    1:18-cv-00831-LF

ANDREW M. SAUL,[1] Commissioner
of the Social Security Administration,

        Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

        THIS MATTER comes before the Court on plaintiff Yvette Montoya's Motion to

Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 21), which was fully

briefed on June 13, 2019.  *See* Docs. 24, 27, 28.  The parties consented to my entering final

judgment in this case.  Docs. 4, 7, 8.  Having meticulously reviewed the entire record and being

fully advised in the premises, I find that the Administrative Law Judge's ("ALJ") decision to

give treating physician Dr. Santos's opinion "limited weight" is not supported by substantial

evidence.  I therefore GRANT Ms. Montoya's motion and remand this case to the Commissioner

for further proceedings consistent with this opinion.

## I.      Standard of Review

        The standard of review in a Social Security appeal is whether the Commissioner's final

decision[2] is supported by substantial evidence and whether the correct legal standards were

---

[1] Andrew M. Saul became the Commissioner of the Social Security Administration on June 17, 2019, and is automatically substituted as the defendant in this action.  FED. R. CIV. P. 25(d).

[2] The Court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which generally is the ALJ's decision, 20 C.F.R. §§ 404.981, 416.1481, as it is in this case.

applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008). If substantial evidence supports the Commissioner's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks and brackets omitted). The Court must meticulously review the entire record, but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* While the Court may not reweigh the evidence or try the issues de novo, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence.'" *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

II.     **Applicable Law and Sequential Evaluation Process**

To qualify for disability benefits, a claimant must establish that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

2

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).

When considering a disability application, the Commissioner is required to use a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show: (1) the claimant is not engaged in "substantial gainful activity;" (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) the impairment(s) either meet or equal one of the Listings[3] of presumptively disabling impairments; *or* (4) the claimant is unable to perform his or her "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261. If the claimant cannot show that his or her impairment meets or equals a Listing but proves that he or she is unable to perform his or her "past relevant work," the burden then shifts to the Commissioner, at step five, to show that the claimant is able to perform other work in the national economy, considering the claimant's residual functional capacity ("RFC"), age, education, and work experience. *Id.*

### III.    Background and Procedural History

Ms. Montoya was born in 1958 and graduated from high school in 1976. AR 230, 235.[4] She worked for many years in the electronics assembly industry. AR 236, 652−58, 668−77. Ms. Montoya filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on February 19, 2013, alleging disability since August 26, 2012 due to the

---

[3] 20 C.F.R. pt. 404, subpt. P, app. 1.

[4] Document 14 is the sealed Administrative Record ("AR"). When citing to the record, the Court cites to the AR's internal pagination in the lower right-hand corner of each page, rather than to the CM/ECF document number and page.

following impairments: numbness in her right back, right buttock, right calf and right toes; injuries to her lower and upper back and right buttocks, right hand weakness and pain, right-sided carpal tunnel syndrome, right finger pain, trigger finger on the right hand, pinched nerve in the right shoulder; inability to sit, stand, or walk for more than 10 minutes at a time; inability to carry objects weighing more than 10 pounds, and inability to drive without pain. AR 187–99, 234. The Social Security Administration ("SSA") denied her claims initially on August 9, 2013. AR 124–28. The SSA denied her claims on reconsideration on October 28, 2013. AR 131–35. Ms. Montoya requested a hearing before an ALJ. AR 136–37. On March 19, 2015, ALJ Eric Weiss held a hearing. AR 26–75. ALJ Weiss issued his unfavorable decision on April 29, 2015. AR 9–25. Ms. Montoya requested review of the ALJ's unfavorable decision by the Appeals Council. AR 5–8. On September 1, 2016, the Appeals Council denied the request for review. AR 1–4.

Ms. Montoya timely filed her first appeal to this Court on November 4, 2016.[5] AR 706–07 (*Montoya v. Berryhill*, No. 16cv1214 KBM, Doc. 1 (D.N.M. Nov. 4, 2016)). On September 22, 2017, the Commissioner moved for a remand pursuant to sentence four of 42 U.S.C. § 405(g), which the Court granted. No. 16cv1214 KBM, Docs. 26, 27. On remand, the Appeals Council vacated the final decision of the Commissioner and remanded to the ALJ for "[f]urther evaluation of the opinion of treating source James Santos, M.D." AR 763.

> Specifically, the Administrative Law Judge stated that Dr. Santos's opinion was "less persuasive" than the opinions of consultative examiner Raul Young-Rodriguez, M.D. and the State agency medical consultants because Dr. Santos's opinion "contrasts sharply" with the other evidence of record and the other medical opinions (Decision, page 8). However, the decision does not reflect consideration of significant countervailing evidence in Dr. Santos's treatment

---

[5] While her first appeal was pending in this Court, Ms. Montoya filed second applications for both DIB and SSI. AR 710, 720. On remand, the Appeals Council ordered Ms. Montoya's claims be consolidated. AR 764.

records contained at Exhibit 10F, including a July 2014 cervical spine MRI showing moderate disc degeneration at C5-6 with loss of disc height and a right paracentral and interforaminal disc extrusion that results in moderate right foraminal stenosis, with a central annular tear at this level, and an EMG/NCS study from February 2013 that showed mild right median mononeuropathy at the wrist and demyelinating features affecting the sensory fibers (Exhibit 10F, pages 15 and 17). Consultative examiner Dr. Young-Rodriguez and the State agency medical consultants did not review the treatment records from Dr. Santos; their opinions were provided prior to the submission of Dr. Santos's treatment records and prior to the claimant's July 2014 cervical spine MRI described above. In addition, in evaluating the opinion of Dr. Santos, the hearing decision does not address those factors discussed at 20 CFR 404.1527(c) and 416.927(c) for evaluating opinion evidence nor does it contain any specific references to the evidence of record to support the weight assigned to Dr. Santos's opinion. Thus, further evaluation, pursuant to 20 CFR 404.1527 and 416.927, is warranted.

AR 763–64.

After remand from the Appeals Council, on April 12, 2018, ALJ Weiss held a second hearing. AR 648−82. On May 4, 2018, the ALJ issued a partially favorable decision—finding Ms. Montoya disabled from June 17, 2015 forward, but not disabled prior to that date. AR 616−47.

The ALJ found that Ms. Montoya met the insured requirements of the Social Security Act through December 31, 2016. AR 624. At step one, the ALJ found that Ms. Montoya had not engaged in substantial, gainful activity since August 21, 2012, her alleged onset date. *Id*. At step two, the ALJ found that Ms. Montoya suffered from the following severe impairments: "[o]steoarthrosis; degenerative disc disease; cervical spondylosis; cervicalgia, cervical radiculopathy; carpal tunnel syndrome, facet syndrome; lumbago; right trigger finger, thoracic outlet syndrome; and right AC joint arthropathy." *Id*. Beginning on June 17, 2015, the date the ALJ found Ms. Montoya disabled, the ALJ found that, in addition to all the above severe impairments, Ms. Montoya also had "left cubital tunnel syndrome status post open ulnar nerve decompression; and left shoulder osteoarthritis status post left shoulder replacement." *Id*.

At step three, the ALJ found that none of Ms. Montoya's impairments, alone or in combination, met or medically equaled a Listing. AR 625–27. Because the ALJ found that none of the impairments met a Listing, the ALJ assessed Ms. Montoya's RFCs. AR 627–37. Prior to June 17, 2015, the ALJ found Ms. Montoya had the RFC to

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant could lift, carry, push, or pull 20 pounds occasionally and 10 pounds frequently. She was able to stand or walk for six hours per eight-hour day and sit for six hours per eight-hour day with normally scheduled breaks. She could occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds. The claimant was able to occasionally balance, stoop, crouch, and kneel, but could never crawl. She was able to frequently reach, handle, and finger with her upper extremities. She had to avoid more than occasional exposure to unprotected heights.

AR 627. Beginning on June 17, 2015, the ALJ found Ms. Montoya had the RFC to

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can lift up to 10 pounds occasionally. She can stand or walk for two hours per eight-hour day and sit for six hours per eight-hour day with normally scheduled breaks. The claimant is able to occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds. She is able to occasionally balance, stoop, crouch, and kneel, but never crawl. The claimant can occasionally reach, handle, and finger with her bilateral upper extremities. She must avoid exposure to unprotected heights, dangerous moving machinery, and pulmonary irritants such as dust, fumes, odors, and gasses.

AR 634–35.

At step four, the ALJ concluded that, prior to June 17, 2015, Ms. Montoya was capable of performing her past relevant work as an "electronics assembler" and as a "production expeditor" as that work is generally performed. AR 637–38. Because she could perform her past relevant work, the ALJ concluded that she was not disabled prior to June 17, 2015. AR 638. Beginning on June 17, 2015, the ALJ found that Ms. Montoya could not perform her past relevant work. *Id*. At step five, for the period beginning on June 17, 2015, the ALJ found that considering Ms. Montoya's age, education, work experience and RFC, there were no jobs that exist in significant numbers that Ms. Montoya could perform. *Id*. The ALJ therefore found Ms. Montoya disabled

beginning on June 17, 2015.  *Id.*  Ms. Montoya timely filed her appeal to this Court on August 31, 2018.  Doc. 1.[6]

## IV.    Ms. Montoya's Claims

Ms. Montoya raises two arguments for reversing and remanding this case:  (1) the ALJ erred in weighing the opinion of treating physician Dr. James Santos; (2) the RFC is not supported by substantial evidence because the ALJ failed to account for Ms. Montoya's subjective allegations of pain and other symptoms.  *See* Doc. 21.  Because I remand based on the ALJ's failure to properly weigh the opinion of Dr. Santos, I do not address the other alleged error, which "may be affected the ALJ's treatment of this case on remand."  *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

### A.    Summary of Dr. Santos's Treatment Records

Dr. James Santos, a doctor board-certified in physical medicine and rehabilitation,[7] treated Ms. Montoya more than twenty times between August 2013 and May 2015.  *See* AR 380–83, 391–92, 405–09, 432–43, 447–50, 457–60, 465–68, 479–88, 495–97, 502–03, 509–10, 522–23, 536–37, 590–91, 600–04, 606–08, 612–15, 1162–63.

On August 23, 2013, Ms. Montoya saw Dr. Santos for an initial exam.  AR 380–83.  Ms. Montoya reported low back pain, present for more than one year, which resulted in the inability to stand for more than 30 minutes at a time and a pain level of 7 out of 10, with pain made worse

---

[6] Because this Court previously remanded Ms. Montoya's case, Ms. Montoya was not required to seek Appeals Council review again, and the ALJ's decision stands as the final decision of the Commissioner.  *See* 20 C.F.R. § 404.984(a).  If the claimant does not file exceptions and the Appeals Council does not assume jurisdiction of the case, the ALJ's decision becomes final 61 days after it is issued.  20 C.F.R. § 404.984 (b)–(d); AR 617.  The claimant then has 60 days to file an appeal to this Court.  20 C.F.R. § 404.981.

[7] *See* New Mexico Orthopaedics website at https://www.nmortho.com/james-santos-md/ (last visited Nov. 20, 2019).

by activities.  AR 380.  Ms. Montoya also reported "neck pain, joint pain, joint swelling, back pain," and a weak right hand and arm that became sore with use.  *Id.*  On lumbar exam, Dr. Santos noted that Ms. Montoya had "[t]enderness to palpation" of the "right buttocks" but no other significant findings.  AR 382.  Dr. Santos reviewed an MRI done by High Resolution in September of 2012 and noted that it showed the following:

> Multilevel moderate disc degeneration from L2-3 through L5-S1.  There is a left paracentral disc protrusion with an annular tear at L5-S1.  There is a far left disc protrusion an[d] annular tear noted at L4-5.  There is a small left paracentral disc protrusion at L2-3 with annular tear.  There is moderate facet joint arthropathy L4-5 with effusions.

*Id.*  Dr. Santos diagnosed Ms. Montoya with "persistent axial lumbar pain in the setting of multilevel disc degeneration with annular tears at L2-3, L4-5, and L5-S1 and facet joint arthropathy most pronounced at L4-5."  AR 383.  Dr. Santos opined that the "[e]tiologies of the axial pain could include:  discogenic pain, facet syndrome, or sacroiliac joint dysfunction."  *Id.*  Dr. Santos noted that Ms. Montoya reported that she received "about a 90% reduction in her pain levels following physical therapy, but her residual pain still affects her quality of life" and limits her functional activities.[8]  AR 383, 405.  Ms. Montoya "agreed to undergo a diagnostic[9] and therapeutic facet joint injections [left] laterally at L4-5 and L5-S1."  AR 383.

---

[8] Dr. Santos's treatment note says that Ms. Montoya "did receive about a 90% reduction in her pain levels following physical therapy, **but** her residual pain still affects her quality of life and **doesn't limit** her functional activities."  AR 383 (emphasis added).  Dr. Santos later summarized this same visit to indicate that "her residual pain **was so affecting** her functional activities."  AR 405 (emphasis added).  Given that Ms. Montoya repeatedly reported functional limitations to Dr. Santos and the grammatical awkwardness of "doesn't limit" in the first sentence as part of the "but" clause, the Court finds Dr. Santos's later characterization of the visit to be the accurate one.

[9] "Although imaging (radiographs, MRI, CT, SPECT) for [facet joint] syndrome is very commonly performed, there are no effective correlations between clinical symptoms and degenerative spinal changes.  Diagnostic positive facet joint block can indicate facet joints as the source of chronic spinal pain.  These patients may benefit from specific interventions to

On September 9, 2013, Dr. Santos performed a diagnostic and therapeutic right L4-5 and left L4-5 facet block. AR 391–92. On November 14, 2013, Ms. Montoya reported a 60% reduction in her low back pain following the facet joint injections. AR 495. She reported a current pain level of 6 out of 10, continued numbness, pain with activities, radiating pain, and night pain. *Id.* She reported "constant pain" and pain when "trying to do anything." *Id.* On lumbar exam, Dr. Santos found a limited range of motion due to pain, and decreased extension. AR 496. Dr. Santos assessed Ms. Montoya with "moderately improved, persistent axial lumbar pain in the setting of multilevel disc degeneration and annular tears and facet joint arthropathy, most pronounced at L4-5." AR 497. He scheduled Ms. Montoya for repeat bilateral L4-5 facet joint injections. *Id.*

On November 25, 2013, Dr. Santos performed diagnostic and therapeutic bilateral L4-5 facet joint injections AR 502–03. On January 7, 2014, Ms. Montoya reported a 60% pain reduction in pain following the facet joint injections but reported a current pain level of 8 out of 10, and that she continued to have pain with activities, radiating pain, and night pain. AR 486. She reported that "the injection only helps when she isn't doing anything." *Id.* Dr. Santos scheduled Ms. Montoya for a medial branch block[10] of the L4-5 facet joints bilaterally. AR 488.

_____

eliminate facet joint pain such as neurolysis, by radiofrequency or cryoablation." Perolat, R., Kastler, A., Nicot, B. et al., Facet joint syndrome: from diagnosis to interventional management. Insights Imaging 9, 773–89 (2018), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6206372/ (last visited Nov. 20, 2019).

[10] "A medial branch nerve block is a procedure in which an anesthetic is injected near small medial nerves connected to a specific facet joint. If the patient experiences marked pain relief immediately after the injection, then the facet joint is determined to be the source of the patient's pain. The procedure is primarily diagnostic, meaning that if the patient has the appropriate duration of pain relief after the medial branch nerve block, then he or she may be a candidate for a subsequent procedure—called a medial branch radiofrequency neurotomy (or ablation)—for longer term pain relief." Medial Nerve Branch Blocks, Spine Health, available at https://www.spine-health.com/treatment/injections/medial-branch-nerve-blocks (last visited Nov. 20, 2019).

On January 27, 2014, Dr. Santos performed a diagnostic right L4-5 and left L4-5 facet block via injection of right L3, left L3, right L4 and left L4 medial branch nerves. AR 509. On February 19, 2014, Ms. Montoya reported a 20 to 30% reduction in pain for the six hours following the injection, with some relief from pain lasting two days after the facet block injection. AR 483. She reported a current pain level of 7 out of 10. *Id*. Dr. Santos assessed Ms. Montoya with "transiently improved axial lumbar pain after her intra-articular steroid injections within the facet joints in the setting of spondylosis." AR 485. Because Ms. Montoya had an "atypical response" to the facet block injection, Dr. Santos decided to repeat the procedure and "add one level." *Id*. Dr. Santos scheduled Ms. Montoya for a "medial branch block on the L4-5 and L5-S1 facet joints" that would "effectively block the bilateral L3 and L4 medial branches and bilateral L4 dorsal primary rami." *Id*.

On February 24, 2014, Dr. Santos performed a diagnostic right L4-5, left L4-5, right L5-S1, and left L5-S1 facet block via injection of the right L3, left L3, right L4 and left L4 medial branch nerves and right L5 and left L5 dorsal rami. AR 522.

On February 27, 2014, Ms. Montoya reported pain localized bilaterally along the upper and inner parascapular region. AR 479. On physical exam, Dr. Santos noted pain/tenderness when he palpated the trigger points of the bilateral trapezius, levator scapula, and rhomboids. AR 482. Dr. Santos ordered thoracic x-rays, which showed mild scoliosis. *Id*. Dr. Santos diagnosed Ms. Montoya with "chronic upper thoracic axial pain with clinical evidence of extensive myofascial spasms." *Id*.

On March 25, 2014, Ms. Montoya was seen for follow up after the February 24, 2014 facet injections. AR 465. Ms. Montoya reported a pain level of 7 out of 10 and pain with activities, with symptoms unchanged from her previous visit. *Id*. She reported an 80 to 90%

pain reduction of her lower back pain for approximately 6 hours after the facet block injections, but also reported some numbness and tingling in her legs after the injections. AR 465, 520. Dr. Santos noted that Ms. Montoya had "chronic paresthesias in her right leg." AR 465. Dr. Santos assessed Ms. Montoya with "axial lumbar pain secondary to facet syndrome at L4-5 and L5-S1 in the setting of spondylosis." AR 467. Dr. Santos noted that Ms. Montoya had "a positive response to the last medial branch block, but she is concerned that the radiofrequency right rhizotomy[11] would cause leg symptoms. After a long discussion with the patient, we have agreed to have her return for a repeat set of medial branch blocks and determine whether she experiences the same symptoms in her legs." *Id.*

On March 31, 2014, Dr. Santos performed a diagnostic right L4-5, left L4-5, right L5-S1 and left L5-S1 facet block injection via injection of the right L3, left L3, right L4 and left L4 medial branch nerves and right L5 and left L5 dorsal rami. AR 536. On April 16, 2014, Ms. Montoya reported a pain level of 8 out of 10, pain with activities, and symptoms unchanged since her last visit. AR 447. Ms. Montoya reported 100% relief of her back pain for the 6 hours that she recorded her pain after the March 31, 2014 facet block injections. *Id.* Dr. Santos assessed her with "axial lumbar pain secondary to facet syndrome at L4-5 and L5-S1 in the setting of spondylosis." AR 450. Noting that Ms. Montoya had two positive responses to medial branch blocks, Dr. Santos scheduled Ms. Montoya for bilateral radiofrequency rhizotomy at L3, L4, and L5. *Id.*

On April 29, 2014 Ms. Montoya reported a pain level of 8 out of 10, and pain with activities. AR 441. She reported that her pain had worsened since her last visit. *Id.* Ms.

---

[11] A rhizotomy is a surgical procedure to sever nerve roots in the spinal cord. Spine Health, Rhizotomy Definition, available at https://www.spine-health.com/glossary/rhizotomy (last visited Nov. 20, 2019).

Montoya complained of upper thoracic and scapular pain. *Id*. Dr. Santos assessed Ms. Montoya with "chronic upper thoracic axial pain with clinical evidence of myofascial spasms," administered trigger point injections in her right levator scapulae and right rhomboid, and referred her to physical therapy. AR 438, 443.

On June 25, 2014, Ms. Montoya reported a pain level of 6 out of 10, numbness in her hands, pain with activities radiating to both shoulders, and night pain. AR 437. Ms. Montoya reported that the April 29, 2014 trigger point injections had provided improvement in her symptoms that lasted about two weeks. *Id*. She reported continued pain in the right and left upper scapular regions, which persisted even after the completion of physical therapy. AR 439. Dr. Santos noted that the radiofrequency rhizotomy he had scheduled at the April 16, 2014 visit had been delayed because Ms. Montoya had an abnormal ECG and had to undergo cardiac clearance. AR 438. On physical exam, Dr. Santos palpated bilateral trigger points and noted pain/tenderness in the upper trapezius and levator scapula. AR 439. He also noted positive Impingement Sign Tests for both the left shoulder and right shoulder. *Id*. Dr. Santos administered repeat trigger point injections in Ms. Montoya's bilateral upper trapezius and levator scapula. AR 440. Dr. Santos assessed Ms. Montoya with "upper thoracic axial pain with clinical evidence of myofascial spasms that was transiently resolve[d] with trigger point injections" and "bilateral shoulder pain with impingement signs." *Id*. Regarding her thoracic axial pain, Dr. Santos found that Ms. Montoya had "persistent pain that has been refractory to conservative treatment over the past few weeks," ordered an MRI of her cervical spine, and referred her to physical therapy for her shoulders. *Id*. In order to treat Ms. Montoya's axial lumbar pain/facet syndrome, Dr. Santos rescheduled Ms. Montoya's radiofrequency rhizotomy at L3, L4, and L5. *Id*.

On July 22, 2014, Ms. Montoya reported a pain level of 7 out of 10, pain with activities, especially with overhead activities, and said that her pain persisted without significant change. AR 432–33. She also reported persistent numbness and tingling in her right ring and little finger, along with subjective weakness. AR 433. Dr. Santos noted that Ms. Montoya had a history of carpal tunnel with carpal tunnel release. *Id.* He further noted that "an EMG/NCS performed by Dr. Knaus in February of 2013 revealed mild right median mononeuropathy at the wrist with demyelinating features affecting the sensory fibers only." *Id.* Dr. Santos reviewed the MRI he had ordered, which was done in-house at New Mexico Orthopedics on July 8, 2014, and found that it showed:

> C5-6 Moderate disc degeneration with loss of disc height and a right paracentral and interforaminal disc extrusion that results in moderate right foraminal stenosis. She does have a central annular tear at this level.

AR 435. Dr. Santos assessed Ms. Montoya with "persistent bilateral upper scapular axial pain in the clinical setting of myofascial spasms and cervical spondylosis at C5-6. She is also assessed with persistent right upper extremity paresthesias and subjective weakness with suspected right C6 radiculitis." *Id.* For her should pain, Dr. Santos prescribed physical therapy and a cervical traction unit for use at home. AR 435, 537. For her cervical axial pain, Dr. Santos ordered diagnostic and therapeutic cervical facet joint injections bilaterally at C5-6. AR 435. Dr. Santos noted that Ms. Montoya had been scheduled for a radiofrequency rhizotomy of L3, L4, and L5 on July 28, 2014. *Id.*

On August 26, 2014, Ms. Montoya reported a current pain level of 8 out of 10, increased pain with activities, and symptoms unchanged since her prior visit. AR 600. Dr. Santos noted that the radiofrequency rhizotomy of L3, L4, and L5 had been discontinued after it was started due to Ms. Montoya's heart rate dropping during the procedure. AR 604. He also noted that she

had undergone further cardiac clearance, and that the procedure would be rescheduled. *Id.* On cervical exam, Dr. Santos found pain and tenderness when he palpated the trigger point for the bilateral paraspinals and noted "myofascial spasm in the cervical paraspinals." AR 603–04. Dr. Santos administered trigger point injections in Ms. Montoya's bilateral cervical paraspinals. AR 603. Dr. Santos rescheduled Ms. Montoya's bilateral L3, L4, and L5 radiofrequency rhizotomy. AR 604. In addition, Dr. Santos scheduled her for medial branch blocks at C5 and C6. *Id.*

On September 10, 2014, Dr. Santos performed a diagnostic left C5-6 facet block injection of the left C5 and left C6 medial branch nerves. AR 590. Dr. Santos listed pre-op diagnoses of "chronic cervicalgia" and "cervical spondylosis." *Id.*

On October 7, 2014, Ms. Montoya reported a pain level of 9 out of 10, with symptoms unchanged since the last visit. AR 511. She reported numbness in her right leg and pain with activities. *Id.* Ms. Montoya reported an 80 to 90% reduction in left cervical pain for six hours following the medial branch blocks. AR 512. Dr. Santos assessed Ms. Montoya with "chronic cervical axial pain that responded to medial branch block on the left at C5-6" and scheduled her for a radiofrequency neurotomy of the left C5-6 facet joint. AR 515.

On October 15, 2014, Dr. Santos performed destruction of the right L4-5, left L4-5, right L5-S1, and left L5-S1 using "standard radiofrequency thermocoagulation" of the right L3, left L3, right L4, and left L4 medial branch nerves; and of the right L5 and left L5 dorsal rami. AR 410.

On November 25, 2014, Ms. Montoya reported a pain level of 7 out of 10, pain with activities, radiating pain, and night pain. AR 457. She reported "residual pain in her lower back, but the majority of her pain, especially her severe pain, has resolved. She states that her current

pain is manageable and tolerable." *Id.*[12] Dr. Santos assessed Ms. Montoya with "significantly resolve[d] axial lumbar pain after undergoing an RF of the L4-5 and L5-S1 facet joints." AR 459. Dr. Santos noted that Ms. Montoya had had "a positive response to the medial branch blocks of the C5–6 facet joint" and planned to perform a radiofrequency neurotomy of this joint in early 2015. *Id.* Dr. Santos also ordered another EMG/NCS of Ms. Montoya's right lower extremity. *Id.*

On January 19, 2015, Dr. Santos destroyed the left C5-6 using standard radiofrequency thermocoagulation of the left C5 and left C6 medial branch nerves. AR 606. Dr. Santos listed diagnoses of "chronic cervicalgia" and "cervical spondylosis." *Id.*

On March 3, 2015, Ms. Montoya reported a pain level of 8 out of 10, pain and "clicking" with activities, and stated that her symptoms remained unchanged since her previous visit. AR 612. Ms. Montoya reported that the radiofrequency neurotomy of C5-6 did not alleviate her neck pain. *Id.* Dr. Santos assessed Ms. Montoya with "persistent left-sided cervical axial pain that was unresponsive to an RF of the C5-6 facet joints." AR 615. Dr. Santos scheduled Ms. Montoya for a medial branch block of the C3-4 facet joints. *Id.* Ms. Montoya reported a persistent pain in her right buttock due to a "knot," for which Dr. Santos asked her to return for a reevaluation. *Id.*

On May 4, 2015, Dr. Santos performed a diagnostic left C3-4 facet block of the left C3 medial branch nerve and the left C4 medial branch nerve. AR 1163. Dr. Santos listed pre-op diagnoses of "chronic cervicalgia" and "cervical spondylosis." AR 1162.

---

[12] The Court reads this to mean that the majority of Ms. Montoya's **lower back pain** had resolved and that her **lower back pain** was "tolerable and manageable." *See* AR 457. The fact that Ms. Montoya reported a current pain level of 7 out of 10, and the fact that Dr. Santos planned to do a radiofrequency neurotomy on the C5-6 facet joint within a few months, supports this reading. AR 457, 459.

B. <u>Analysis</u>

Ms. Montoya argues that the ALJ "improperly weighed Dr. Santos' opinion." Doc. 21 at
17. She argues that the ALJ did not give "legitimate" reasons for giving Dr. Santos's opinion
"limited weight." *Id*. at 15–18. The Commissioner argues that the ALJ provided adequate
reasons for discounting Dr. Santos's "restrictive opinion." Doc. 24 at 10–14. I agree with Ms.
Montoya.

In analyzing whether a treating source opinion is entitled to controlling weight, the ALJ
must perform a two-step process. First, the ALJ must consider whether the opinion "is well
supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent
with the other substantial evidence in the record." *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th
Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2); *Watkins*, 350 F.3d at 1300). If the opinion meets
both criteria, the ALJ must give the treating source's opinion controlling weight. *Id*. To give
anything less than controlling weight, the ALJ must demonstrate with substantial evidence that
the opinion (1) is not "well-supported by medically acceptable clinical and laboratory diagnostic
techniques," or (2) is "inconsistent with other substantial evidence" in the record. 20 C.F.R.
§ 404.1527(c)(2).

If the ALJ does not assign a treating source's opinion controlling weight, step two of the
analysis requires the ALJ to apply the six factors listed in the regulations to determine whether a
treating source's opinion should be rejected altogether or assigned some lesser weight:

1. **Examining relationship**: more weight is given to the opinion of a source
   who has examined the claimant than to one who has not;
2. **Treatment relationship**: more weight is given to the opinion of a source
   who has treated the claimant than to one who has not; more weight is given to
   the opinion of a source who has treated the claimant for a long time over
   several visits and who has extensive knowledge about the claimant's
   impairment(s);

3. **Supportability:** more weight is given to a medical source opinion which is supported by relevant evidence (such as laboratory findings and medical signs), and to opinions supported by good explanations;
4. **Consistency:** the more consistent the opinion is with the record as a whole, the more weight it should be given;
5. **Specialization**: more weight is given to the opinion of a specialist giving an opinion in the area of his/her specialty; and
6. **Other factors:** any other factors that tend to contradict or support an opinion.

*See* 20 C.F.R. §§ 404.1527(c)(1)–(6), 416.927(c)(1)–(6) (effective March 27, 2017); *see also*

*Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Watkins*, 350 F.3d at 1301. As the first

two factors make clear, even if an ALJ determines that a treating source opinion is not entitled to

controlling weight, the opinion still is entitled to deference. SSR 96-2p, 1996 WL 374188, at *4

(July 2, 1996)[13]; *see also Watkins* 350 F.3d at 1300.

"Under the regulations, the agency rulings, and our case law, an ALJ must 'give good

reasons in [the] notice of determination or decision' for the weight assigned to a treating

[source's] opinion." *Watkins*, 350 F.3d at 1300 (quoting 20 C.F.R. § 404.1527(d)(2) and citing

SSR 96-2p, 1996 WL 374188, at *5; *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003)).

The reasons must be "tied to the factors specified in the cited regulations." *Krauser v. Astrue*,

638 F.3d 1324, 1330 (10th Cir. 2011) (citing *Watkins*, 350 F.3d at 1300–01). And the reasons

must be "supported by the evidence in the case record" and "sufficiently specific to make clear to

any subsequent reviewers the weight the adjudicator gave to the treating source's medical

opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5.

---

[13] SSR 96-2p was rescinded for claims filed after March 27, 2017. *See* Federal Register Notice Vol. 82, No. 57, page 15263. Since Ms. Montoya filed her claims on February 19, 2013 (AR 187–99) and January 24, 2017 (AR 710, 720), SSR 96-2p applies to her claims.

On October 14, 2014, Dr. Santos completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) in which he opined that Ms. Montoya had the following limitations:

- continuously lift and carry up to 10 pounds, but never more than 10 pounds;
- sit for one hour at a time, and for a total of one hour in an 8-hour work day;
- stand and walk less than one hour at a time, and less than one hour in an 8-hour workday;
- occasionally reach, handle, finger, feel, push and pull with the right hand;
- occasionally climb stairs, stoop, crouch, and kneel;
- never climb ladders and scaffolds, crawl, or balance; and
- unable to work two days per month due to her impairments.

AR 412–17. Dr. Santos opined that Ms. Montoya had these limitations for a year before he began treating her on August 23, 2013. AR 417.

The ALJ gave Dr. Santos's opinion "limited weight." AR 633.[14] The ALJ provided three reasons for this weight: (1) Dr. Santos's opinion was not consistent with his examination findings; (2) Dr. Santos did not provide an explanation for the severity of his opined limitations; (3) Dr. Santos interpreted two MRIs as showing more significant changes than those noted by the imaging providers. AR 633–34. Ms. Montoya argues that these reasons "are not legitimate bases for assigning only limited weight to Dr. Santos's opinion." Doc. 21 at 16. Although the reasons given by the ALJ go to supportability, consistency, and "other factors" which are facially valid factors for the ALJ to consider in weighing Dr. Santos's opinion, *see* 20 C.F.R. §§ 404.1527(c)(1)–(6), 416.927(c)(1)–(6), Ms. Montoya argues that the ALJ's reasons are not supported by substantial evidence. *See* Doc. 21 at 16–18. The Court agrees. The reasons given by the ALJ are not "supported by the evidence in the case record." SSR 96-2p, 1996 WL

---

[14] The ALJ did not analyze whether Dr. Santos's opinion was entitled to controlling weight, and therefore did not do the first step of the treating physician analysis. Ms. Montoya does not argue this issue and therefore has waived any claim of error related to this step of the treating physician analysis.

374188, at *5. The ALJ's reasons for discounting Dr. Santos's opinion are "overwhelmed by other evidence in the record" and therefore are not supported by substantial evidence. *Langley*, 373 F.3d at 1118.

The ALJ's assertion that Dr. Santos's opinion was not consistent with his examination findings is not supported by substantial evidence. To support this assertion, the ALJ cherry-picked select pieces of Dr. Santos's treatment records, while ignoring the rest. This is not sufficient. An ALJ is not required to discuss every piece of evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). However, an ALJ is required to discuss uncontroverted evidence not relied upon and significantly probative evidence that he or she rejects. *Id*. at 1010. "It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his [or her] position while ignoring other evidence." *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004).

The ALJ found that Dr. Santos's opinion was "not consistent with his examination findings" because

> Only a week before he completed his medical source statement, his physical examination of the claimant revealed a non-antalgic gait, no assistive device, an erect posture, and the claimant in no acute distress (Ex. 8F, 4). He found the same upon his last examination of the claimant on July 22, 2014 (Ex. 10F, 17). In addition, he performed an examination of the claimant's cervical spine and found normal sensation on the left, normal motor strength on the left, impaired sensation on the right at C8, but otherwise normal sensation throughout her cervical spine on the right, and normal motor strength on the right (Ex. 10F, 17).

AR 633. However, the physical exam note about Ms. Montoya having a non-antalgic gait, using no assistive device, having an erect posture, and not being in acute distress appears identically in most of Dr. Santos's treatment records. *See* AR 382, 408, 435, 449, 459, 467, 481, 485, 488, 496, 514, 603, 614. The ALJ relied on this "cut-and-paste" note to show that Dr. Santos's opinion was inconsistent with his examination findings, while ignoring the bulk of Dr. Santos'

examination findings.  The bulk of Dr. Santos's treatment notes show that Ms. Montoya repeatedly complained of significant pain, and that Dr. Santos ordered numerous diagnostic and therapeutic interventions to treat this pain.  *See* summary of Dr. Santos's treatment *supra*.  Dr. Santos's treatment records show that he found Ms. Montoya's complaint of pain credible, and that he continually attempted to diagnose and treat the sources of her pain.  *Id*.  His examination findings are replete with objective evidence supporting the limitations in his opinion.  *See* AR 382 ("tenderness to palpation" of the "right buttocks" noted); AR 382 (MRI showing multilevel moderate disc degeneration from L2-3 through L5-S1, left paracentral disc protrusion with an annular tear at L5-S1, left disc protrusion an[d] annular tear at L4-5, small left paracentral disc protrusion at L2-3 with annular tear, and moderate facet joint arthropathy at L4-5 with effusions.); AR 406 (Dr. Santos noted that cervical pain "responded to medial branch block" and resulted in 80 to 90% reduction in left cervical pain for 6 hours following the cervical facet block injections); AR 433 (review of EMG/NCS performed by Dr. Knaus in February 2013 revealing "mild right median mononeuropathy at the wrist with demyelinating features affecting the sensory fibers"); AR 435 (MRI showing moderate disc degeneration at C5-6 with loss of disc height and disc extrusion, foraminal stenosis, and a central annular tear); AR 439–40 (Dr. Santos palpated bilateral trigger points and noted pain in upper trapezius and levator scapula, and noted positive impingement signs in both shoulders); AR 441 (clinical evidence of myofascial spasms noted); AR 447–50 (further diagnostic facet injections resulted in a temporary 100% reduction in pain; second "positive response to medial branch block" noted); AR 465–67 (further diagnostic facet injections resulted in a temporary 80 to 90% reduction in pain; "positive response to medial branch block" noted); AR 482 (physical exam shows pain and tenderness of trigger points of the bilateral trapezius, levator scapula, and rhomboids); AR 495 (diagnostic facet injections resulted

in a temporary 60% reduction in pain); AR 496 (lumbar exam showed limited range of motion due to pain, and decreased extension); AR 603–04 (physical exam showed pain and tenderness when palpating the trigger point for the bilateral paraspinals, "myofascial spasm" noted).[15]

In short, Dr. Santos's examination findings are replete with objective evidence showing that Ms. Montoya suffered from persistent pain, and that this pain was not resolved at the time Dr. Santos issued his opinion. The ALJ ignored the bulk of Dr. Santos's examination findings in asserting that the doctor's opinion was not consistent with his examination findings. Thus, the ALJ's assertion is not supported by substantial evidence, and remand is required.

Finally, even if the Court were to agree that the ALJ's assertion is supported by substantial evidence, Dr. Santos's cut-and-paste note stating that Ms. Montoya had a non-antalgic gait, used no assistive device, had an erect posture, and was in no acute distress[16] might be somewhat inconsistent with the limitations Dr. Santos found in Ms. Montoya's abilities to stand and walk, but it is in no way inconsistent with the other limitations in Dr. Santos's opinion—including the limitations he found in Ms. Montoya's abilities to lift; sit; reach, handle, finger, feel, push and pull with the right hand; or the likelihood that she would miss work two

---

[15] Dr. Santos issued his opinion on October 14, 2014. He continued to treat Ms. Montoya for pain after he issued his opinion. AR 410 (radiofrequency thermocoagulation destruction of the L3, L4, branch nerves and the L5 dorsal rami); AR 459 (noting "significantly resolve[d] axial lumbar pain" after the radiofrequency destruction, and "positive response" to the C5-6 facet joint blocks); AR 606 (destruction of the left C5-6 using radiofrequency thermocoagulation); AR 615 (diagnosed with "persistent left-sided cervical axial pain that was unresponsive to an RF of the C5-6 fact joints").

[16] "Acute" means "having a sudden onset, sharp rise, and short course." Merriam Webster Medical Dictionary, available at https://www.merriam-webster.com/dictionary/acute (last visited Nov. 20, 2019). Dr. Santos repeatedly treated Ms. Montoya for persistent pain, so it is understandable that he did not find her to be in "acute" or sudden distress.

days per month due to her impairments. The ALJ offers no explanation of how these limitations are inconsistent with Dr. Santos's examination findings.

The ALJ also stated that Dr. Santos's opinion was inconsistent with his examination findings because on July 22, 2014, Dr. Santos "performed an examination of the claimant's cervical spine and found normal sensation on the left, normal motor strength on the left, impaired sensation on the right at C8, but otherwise normal sensation throughout her cervical spine on the right, and normal motor strength on the right." AR 633 (citing AR 435). Ms. Montoya argues that "a more longitudinal view of Dr. Santos's treatment notes" showed that she had "tenderness, impingement signs, impaired sensation, trigger points and limited range of motion because of pain." Doc. 21 at 16. The Court agrees. Again, the record is replete with subjective and objective evidence of Ms. Montoya's cervical pain. In fact, on July 22, 2014, in the very same treatment note cited by the ALJ, Dr. Santos reviewed an MRI done on July 8, 2014 which showed

> C5-6 Moderate disc degeneration with loss of disc height and a right paracentral and interforaminal disc extrusion that results in moderate right foraminal stenosis. She does have a central annular tear at this level.

AR 435.

Based on his exam and the MRI findings, Dr. Santos assessed Ms. Montoya with "persistent bilateral upper scapular axial pain in the clinical setting of myofascial spasms and cervical spondylosis at C5-6." *Id*. Dr. Santos prescribed physical therapy to treat her shoulder pain, prescribed a home-based cervical traction unit, and scheduled her for "diagnostic and therapeutic cervical facet joint injections bilaterally at C5-6." *Id*. Dr. Santos subsequently noted a "positive response" to the C5-6 facet joint blocks, AR 459, and therefore later proceeded to destroy the left C5-6 nerve using radiofrequency thermocoagulation, AR 606. However, the

radiofrequency thermocoagulation did not relieve Ms. Montoya's pain, and Dr. Santos diagnosed her with "persistent left-sided cervical axial pain that was unresponsive to an RF of the C5-6 facet joints." AR 615. Dr. Santos had objective evidence supporting his diagnosis of cervical pain. The ALJ's citation to part of one treatment note showing benign findings is overwhelmed by other evidence that Dr. Santos's opinion was consistent with his examination findings.

The second reason the ALJ gave for discounting Dr. Santos's opinion—that Dr. Santos "did not provide an explanation for the severity of his opined limitations," AR 633—also does not constitute substantial evidence for giving his opinion limited weight. In *Andersen v. Astrue*, 319 F. App'x 712, 723 (10th Cir. 2009) (unpublished), the Tenth Circuit declined to "categorically reject forms completed by treating physicians" that lack "direct explication." The Tenth Circuit noted that the ALJ should have examined "other materials that could lend support to the conclusions in the forms," including medical reports, medical testing, and the treating physician's examination notes. *Id.* at 724 n.9. In *Andersen*, the Tenth Circuit remanded because the ALJ failed to provide "good reasons" for giving little weight to the treating physician's opinions. *Id.* at 725; *see also Sandoval v. Berryhill*, No. CV 15-0294 JHR, 2017 WL 4772412, at *11 (D.N.M. Oct. 23, 2017) (noting that the Tenth Circuit disfavors giving a treating physician's opinion less weight merely because it was rendered on a check-box form); *Egan v. Berryhill*, No. CV 18-592 KK, 2019 WL 2358409, at *12 (D.N.M. June 4, 2019) (holding that ALJ's rejection of treating physician's opinion based on the fact that the "form letters [were] conclusory" was invalid, where treating physician's treatment notes and the results of the medical tests he ordered supported his opinions). In this case, as in *Andersen*, the medical reports, medical testing, and Dr. Santos's examination notes lend substantial support to the conclusions in his opinion. As

discussed above, the ALJ did not adequately discuss the objective findings in Dr. Santos's treatment records that support his opinion.

The final reason the ALJ gave for giving Dr. Santos's opinion "limited weight" was that Dr. Santos "twice interpreted MRI results as showing more significant changes than did the MRI reports" completed by the imaging providers. AR 633. As the ALJ acknowledged, it is unclear whether Dr. Santos examined the MRIs themselves, or only the reports. AR 633–34. In any case, the Court does not agree with the ALJ's assertion that Dr. Santos's findings were "not consistent" with the findings of the radiologists.

Dr. Santos reviewed an MRI done by High Resolution in September of 2012, stating that it showed

> Multileval moderate disc degeneration from L2-3 through L5-S1. There is a left paracentral disc protrusion with an annular tear at L5-S1. There is a far left disc protrusion an[d] annular tear noted at L4-5. There is a small left paracentral disc protrusion at L2-3 with annular tear. There is moderate facet joint arthropathy L4-5 with effusions.

AR 382. The report from High Resolution by Dr. Luis Centenera about the same MRI made the following "findings:"

- There are minimal to mild degenerative changes of the lumbar spine with minimal dextrocurvature.
- There are minimal to mild multilevel disc bulges, loss of disc signal intensity.
- Most notably at L4-5, there is mild diffuse disc bulge with a minimal eccentric component/small protrusion extending towards the left neural foramen with facet hypertrophy, resulting in overall left greater than right inferior neural foraminal narrowing. . .
- At L5-S1, there is a mild diffuse disc bulge with a small broad-based central component, a superimposed left paracentral high intensity zone and facet hypertrophy, resulting in overall minimal neural foraminal narrowing.
- At L3-4, there is a minimal diffuse disc bulge and facet hypertrophy, which may result in minimal inferior neural foraminal narrowing.

- At L2-3, there is a minimal disc bulge with a superimposed small left paracentral high intensity zone, resulting in overall minimal effacement of the ventral thecal sac.

AR 307.

Dr. Santos used different language than Dr. Centenera, but this does not mean he found "more significant changes" or that the findings are "not consistent" with those of Dr. Centenera. Dr. Santos summarized many of Dr. Centenera's findings and applied his own clinical knowledge of Ms. Montoya when he concluded that Ms. Montoya had "multilevel **moderate disc degeneration** from L2-3 through L5-S1." AR 382. "Magnetic resonance imaging can show damage to discs, but it alone cannot confirm degenerative disc disease." *Degenerative Disc Disease*, Cedars Sinai, available at https://www.cedars-sinai.org/health-library/diseases-and-conditions/d/degenerative-disc-disease.html (last visited Nov. 20, 2019). Diagnosis of degenerative disc disease is based on a medical history, physical examination, and symptoms of pain.[17] *See id*. Ms. Montoya argues that Dr. Santos, as her treating physician, was able to provide a "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." Doc. 21 at 17 (citing *Doyal*, 331 F.3d at 762). The Court agrees. The ALJ found that Dr. Santos's use of the word "moderate" was not consistent with Dr. Centenera's mostly "minimal" and "mild" findings. However, Dr. Centenera did not specifically discuss the level of disc degeneration, nor did the ALJ explain how minimal and mild findings in the aggregate do not demonstrate "moderate disc degeneration." *See Andersen*, 319 F. App'x at

---

[17] The amount of disc degeneration may not be of paramount importance. "It is important to note that the amount of pain does not correlate to the amount of disc degeneration. Severely degenerated discs may not produce much pain at all, and discs with little degeneration can produce severe pain . . . . For this reason, a diagnosis of degenerative disc disease should always rely on a combination of a medical history, a physical exam, and any imaging tests ordered." https://www.spine-health.com/conditions/degenerative-disc-disease/common-symptoms-degenerative-disc-disease (last visited Nov. 20, 2019).

725–26 ("The ALJ appears to have given far too little weight to Dr. Hodges's interpretation of the medical tests. Dr. Hodges noted the results of Mr. Andersen's echocardiogram to be 'mild LV [left ventricular] dilatation,' 'mild LVH [left ventricular hypertrophy],' 'moderate global hypokinesis,' and 'moderate calcific aortic stenosis.' . . . However, these 'mild' and 'moderate' modifiers do not necessarily mean that Mr. Andersen's overall condition is 'mild' or 'moderate.' Nor do they inherently contradict Dr. Hodges's assessment.").

Dr. Santos's summary of the second MRI also was not inconsistent with that radiologist's report. Dr. Santos summarized an MRI from New Mexico Orthopedics done on July 8, 2014 as follows:

> C5-6 Moderate disc degeneration with loss of disc height and a right paracentral and interforaminal disc extrusion that results in moderate right foraminal stenosis. She does have a central annular tear at this level.

AR 435. The radiologist, Pamela H. Burdett, summarized this same MRI as follows:

> C5-6 Uncinate process hypertrophy is present, with mild diffuse disc bulge and a superimposed broad-based central to right foraminal disc extrusion extending 2 mm cranial and caudal to the disc space. There is a central annular tear. Mild effacement of the thecal sac is present without cord compression. There is mild to moderate right lateral recess stenosis and proximal foraminal stenosis, with likely mass-effect on the right C6 nerve root. Mild left foraminal stenosis present.

AR 556. The Court does not agree with the ALJ's assertion that Dr. Santos's interpretation of the MRI conflicts with Dr. Burdett's. Dr. Santos's conclusion that Ms. Montoya has "moderate disc degeneration" is a summary of many of Dr. Burdett's findings, informed by his treatment of Ms. Montoya in a clinical setting.

The Commissioner argues that the Court should "decline to impose Ms. Montoya's preferred reading of the record over the ALJ's well-reasoned findings." Doc. 24 at 12–13. The Court, however, does not find the ALJ's findings to be well-reasoned. Although the ALJ may

have provided facially valid reasons for discounting Dr. Santos's opinion, the ALJ failed to support these reasons with substantial evidence.  Remand is therefore required.

## V.  Conclusion

The ALJ erred by failing to conduct a proper treating physician analysis of the opinion of Dr. Santos.  The Court remands so the Commissioner can properly assess Dr. Santos's opinion. The Court does not reach Ms. Montoya's other claimed error, as this "may be affected by the ALJ's treatment of this case on remand."  *Watkins*, 350 F.3d at 1299.

IT IS THEREFORE ORDERED that Plaintiff's Motion to Reverse and Remand for a Rehearing (Doc. 21) is GRANTED.

IT IS FURTHER ORDERED that the Commissioner's final decision is REVERSED, and this case is REMANDED for further proceedings in accordance with this opinion.

Laura Fashing
United States Magistrate Judge
Presiding by Consent